COURT OF CHANCERY
OF THE
STATE OF DELAWARE

CHRISTIAN DOUGLAS WRIGHT
MAGISTRATE IN CHANCERY

LEONARD L. WILLIAMS JUSTICE CENTER
500 NORTH KING STREET, SUITE 11400
WILMINGTON, DE 19801-3734

June 30, 2026

John G. Harris, Esquire
Halloran Farkas + Kittila LLP
5722 Kennett Pike, Suite C/D
Wilmington, DE 19807

R. Karl Hill, Esquire
Sullivan Nimeroff Brown Hill LLC
919 N. Market Street, Suite 420
Wilmington, DE 19801

Re: *The Cannon Trust 27JUL10, et al., v. Tri-State AG LLC, et al.*,
C.A. No. 2018-0142-CDW

Dear Counsel:

This letter report resolves defendants' Motion for Summary Judgment[1] in this long-pending dispute regarding the management and operations of a family-owned Delaware limited liability company. I recommend the court deny the motion.

## I. BACKGROUND

The following facts are drawn from the admitted allegations in plaintiff's' Verified Complaint ("Complaint")[2] and defendants' Answer,[3] the parties' briefs and attached exhibits submitted in connection with the Motion, and other documents of record.

---

[1] Dkt. 38 ("Motion").

[2] Dkt. 1.

[3] Dkt. 4.

## A.  The Cannon Family, the Trust, and the Farm

This is a familial dispute centered on a 119-acre farm in Frederica, Delaware ("Farm") that has been in the Cannon Family's possession for decades.[4]  On the Farm sits a home ("Farmhouse"), which is leased along with the tillable land for income.[5]  Three plaintiffs are the late Robert Cannon ("Bob"),[6] his widow Thelma Cannon, and their son Gerald Cannon ("Jerry").[7] Bob and Thelma formed plaintiff The Cannon Trust 27JUL10 ("Trust"),[8] a revocable living trust which Bob and Thelma funded with all of their assets.[9] Bob and Thelma were the co-grantors, co-trustees, and primary lifetime beneficiaries, and designated their sons Jerry and Robert Cannon, Jr., as

---

[4] Defs.' Opening Br. in Supp. of Mot. for Summ. J. at 3, Dkt. 44 ("Opening Br."); Pls.' Mem. of Facts and Law in Opp'n to Defs.' Mot. for Summ. J. at 2, Dkt. 48 ("Answering Br.").

[5] Compl. ¶ 21; Ans. ¶ 21; Opening Br. 5; *see* App. to Defs.' Opening Br. in Support of Mot. for Summ. J. ("DX"), Ex. J, Dkt. 44.

[6] Bob passed away on August 8, 2022. *See* Answering Br. 3.

[7] Opening Br. 1–2.

[8] Opening Br. 5; DX I ("Trust Declaration" and cited as "Tr. Decl.").

[9] Tr. Decl. art. Three, § A ("The accompanying Schedule A (incorporated herein by reference) categorically describes those assets with which we are currently funding the living trust."); Tr. Decl. Sched. A (identifying, among other things, "all business assets," "all personal property," and "all assets of any kind and wherever located").

remainder beneficiaries.[10]   Thelma is the Trust's only trustee after Bob's

passing in 2022.[11]

Defendant, the late Edgar Cannon II ("Ed"), was Bob's older brother.[12]

Defendants Edgar Cannon III ("Gary") and Laurie Cannon are Ed's son and

daughter-in-law.[13]  Figure One outlines the parties' familial relationships:



The Cannon family previously operated the Farm as a partnership.[14]

Bob, Ed, and John Cannon were equal partners, each holding a 1/3 interest in

---

[10] Opening Br. 5; Answering Br. 3; *see* Tr. Decl. art. One, § C and art. Two § B.

[11] *See* Tr. Decl. art. One, § C; Opening Br. 5; Answering Br. 3.

[12] Opening Br. 1–2;  Answering Br. 4.

[13] Opening Br. 1–2;  Answering Br. 4.

the Farm.[15]  In 1988, Gary and Laurie acquired John's interest, each in turn became a 1/6 partner.[16]

### B. The Cannons Form Tri-State as a Limited Liability Company

In early 2010, the partners reorganized ownership of the Farm in a Delaware limited liability company and retained attorney James W. Owen to effectuate the reorganization.[17]  On June 24, 2010, the Certificate of Formation of Tri-State AG, LLC ("Tri-State") was filed with the Delaware Secretary of State, naming Owen as the company's registered agent.[18]  On July 27, Bob and Thelma created the Trust.[19]

On March 13, 2011, Bob, Ed, Gary, and Laurie executed the Company Agreement of Tri-State AG, LLC ("LLC Agreement"), and backdated the LLC Agreement's effective date to June 25, 2010.[20]  The LLC Agreement identified Tri-State's members as Bob, Ed, Gary, and Laurie,[21] and vested management

---

[14] Opening Br. 3.

[15] *Id.*

[16] *Id.*

[17] Compl. ¶ 3; Opening Br. 3; DX B, M.

[18] DX B.

[19] *See* Tr. Decl. (dated July 27, 2010).

[20] DX C ("LLC Agreement") § I.4; *id.* 19 (signature lines dated March 13, 2011).

[21] *See* LLC Agreement Art. IV;  LLC Agreement Ex. A (initial capital contributions).

authority in a manager who would be elected by unanimous vote of the members.[22] Attached to the LLC Agreement are the minutes of the first Tri-State members' meeting[23] where Ed was elected as Tri-State's manager.[24] On March 23, 2011, Owen emailed Bob's attorney regarding Bob's membership interest in Tri-State.[25] Owen informed Bob's counsel that he was "preparing the membership certificates, and assume[s] [Bob] has a revocable trust and would want to title his interest in the trust."[26] Owen concluded the email with a request that Bob's counsel confirm if this was the case and, if so, to provide the "proper wording."[27] The record does not evidence a reply to Owen's email. On April 14, Bob, Ed, Gary, and Laurie deeded the Farm to Tri-State.[28]

In a letter dated April 15, Owen sent Bob a Tri-State membership certificate dated July 27, 2010 ("Trust Certificate") that lists the Trust as the

---

[22] LLC Agreement §§ I.8(i), V.1.1–1.2.

[23] LLC Agreement 21. The minutes are also backdated to June 25, 2010. *See id.*

[24] *See* Compl. ¶ 2(b) ("Ed[] was designated the sole manager of Tri-State . . . from the onset . . . ."); Opening Br. 4 ("Ed was elected to serve as the manager."); Answering Br. 4 ("Ed[] was elected by the [m]embers to be [m]anager of [Tri-State].") *But see* Ans. ¶ 2 (denying Ed was the manager). The minutes indicate the members elected a manager, but they do not state who was elected. *See* LLC Agreement 21. The court infers Ed was the individual elected.

[25] *See* DX B.

[26] *Id.*

[27] *Id.*

[28] DX D.

owner of 100 membership units in Tri-State, and was also signed by Ed in his capacity as manager of Tri-State.[29]

## C. Tri-State's Tenant Abandons the Farm, Leaving the Farmhouse in Disrepair

Tri-State rented the Farmhouse to Terry D'Ambrosio for many years until D'Ambrosio vacated the land on or about October 31, 2014.[30] D'Ambrosio left the Farmhouse in a state of disrepair, causing Tri-State to begin renovating the Farmhouse in January 2015.[31] Gary is a licensed engineer and runs a home renovation business part-time, so he opted to do much of the repairs himself, and hired outside contractors for work he could not perform.[32]

On March 14, Bob and Thelma visited Gary and Laurie while they were working on the Farmhouse repairs.[33] During their conversation, Gary informed

---

[29] DX M; *see* PX A (membership certificate). There is no evidence in the record showing that Bob transferred the membership interest from himself to the Trust; other evidence in the record indicates Bob was acting as the member himself and not on behalf of the Trust. *See* DX N (easement agreement where Bob signed on behalf of Tri-State as an "[o]wner."); DX O (Four years of Schedule K-1s listing Bob as the Tri-State member not the Trust); DX E ("Gary Dep. Tr.") 106–07 (testifying that there has "never been a transfer of any [Tri-State] membership interest[.]").

[30] *See* DX J; Compl. ¶ 84; Ans. ¶ 84; Compl. Ex. 13; DX F ("Laurie Dep. Tr.") 13.

[31] Compl. ¶ 84; Ans. ¶ 84; *see* DX G "Jerry Dep. Tr.") 138.

[32] Opening Br. 7; Gary Dep. Tr. 21–24, 33–38, 46–47, 71, 78; Laurie Dep. Tr. 61–64; *see* DX H ("Thelma Dep. Tr.") 43.

[33] Gary Dep. Tr. 38–40; *see* Compl. Ex. 16.

Thelma that he estimated the renovation would cost around $21,000.[34] Thelma and Bob wrote a check for $4,000 from the Trust's bank account, as the first portion of their share of the repair costs.[35] The check was addressed to Gary and Laurie, and Laurie deposited it in her personal bank account.[36] On April 14, Thelma made out a second check to Gary and Laurie for $3,000—making their total contribution to the project $7,000.[37] The renovations were completed in late May and a new tenant took up residence in the Farmhouse on or around early June.[38] In total the Farmhouse repairs cost approximately $27,000, exceeding Gary's initial estimate by nearly 30%.[39] Around this time, Tri-State initiated proceedings in the Justice of the Peace court against D'Ambrosio to recover unpaid rent and for the damage to the Farmhouse ("JP Court Action").[40]

---

[34] Gary Dep. Tr. 38–40; Thelma Dep. Tr. 43; Jerry Dep. Tr. 134–40; Laurie Dep. Tr. 62, 73–75.

[35] Gary Dep. Tr. 38–40; Compl. Ex. 16 (checks); *see* Jerry Dep. Tr. 138–40, 145, 148–50; Laurie Dep. Tr. 74–75. *But see* Gary Dep. Tr. 48 (plaintiffs' counsel stating the funds were drawn from Thelma's bank account).

[36] Compl. Ex. 16; Gary Dep. Tr. 50–52; *see* Jerry Dep. Tr. 150–52.

[37] Compl. Ex. 16; Gary Dep. Tr. 50–52; Laurie Dep. Tr. 62, 74–75; Thelma Dep. Tr. 43–44; Jerry Dep. Tr. 138–39, 148–50.

[38] Laurie Dep. Tr. 61; Gary Dep. Tr. 38–39; Compl. ¶ 85; Ans. ¶ 85.

[39] Gary Dep. Tr. 39–45; Jerry Dep. Tr. 139–40.

[40] *See* Compl. Ex. 13 (final order from the Justice of the Peace court); Jerry Dep. Tr. 136–38 (discussing testimony in the Justice of the Peace court proceedings).

### D. Tensions Rise as the Cannons Feud Over Reimbursements for the Farmhouse Repairs

In a memorandum to Tri-State's members dated August 29, 2015, Gary presented three items for a members' meeting.[41]  The memorandum sought approval to allow Ed to serve as Tri-State's representative in the JP Court Action and how to repay the members for their contributions to the Farmhouse repairs.[42]  Gary stated that because he and Laurie had contributed two-thirds of the renovation costs and Bob contributed one-third, he proposed they be repaid from Tri-State's capital account at a two-to-one ratio.[43]  Gary also sought reimbursement for travel to and from the Farm during the repairs.[44]  The memorandum concluded with an initial proposed capital reimbursement of $3,000 split on the recommended two-to-one ratio between Gary and Laurie on one hand, and Bob on the other.[45]  On September 5, Tri-State issued a $754 check to Ed and a $4,170 check to Gary that he and Laurie claim represented a

---

[41] DX L. The memorandum contains the subject "Current Business" which the court infers is related to a members meeting.

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *Id.*

$2,000 capital reimbursement and $2,170 in travel reimbursements related to the repair.[46]

The JP Court Action continued. On January 8, 2016, the court entered judgment against D'Ambrosio for the unpaid rent owed ("Judgment"), but barred the claim for property damage because Tri-State did not provide D'Ambrosio with an itemized list of the damage within the time prescribed by statute.[47] On January 28, Tri-State issued Ed a second capital reimbursement check for $1,000.[48] Disagreements arose shortly thereafter.

On April 19, Gary, representing himself as a principal of Tri-State, commissioned a real estate firm to appraise the Farm and Farmhouse, which he paid for with Tri-State's funds.[49] Gary maintains he approved the appraisal because it was good business practice; plaintiffs assert that Gary sought the appraisal so his daughter could purchase Ed's membership interest.[50]

Plaintiffs grew increasingly frustrated with Gary and Laurie's handling of Tri-State's funds. On June 15, the Trust served a demand to inspect Tri-

---

[46] Compl. Exs. 14–15; *see* DX L; Compl. ¶¶ 74–75; Ans. ¶¶ 74–75; Laurie Dep. Tr. 73–75.

[47] Compl. Ex. 13 (citing 25 *Del. C.* § 5514).

[48] Gary Dep. Tr. 148.

[49] Compl. Ex. 3; Gary Dep. Tr. 69–70.

[50] Compl. ¶¶ 14–15; Gary Dep. Tr. 69–70; *see* Compl. Ex. 3.

State's books and records under the LLC Agreement and Section 18-305 of the Delaware Limited Liability Company Act[51] to value its interest in Tri-State ("Demand").[52] The Demand requested Tri-State's financial statements and tax returns from 2013 to 2016, "materials concerning Tri-State's debts and[] liabilities for the period from 2013" to 2016, "documents reflecting loans Tri-State has made to its [m]embers," and "[d]ocuments sufficient to show Tri-State's receipts and expenditures from 2013 to [2016], including . . . Tri-State's [g]eneral [l]edger," and its bank and credit card statements.[53] The Demand also sought records related to Tri-State's management, governance, and communications with its members.[54] Tri-State purportedly did not respond to the Demand for nearly two months.[55]

In a letter dated August 9, the Trust's attorney contacted Tri-State to follow up on the Demand.[56] Counsel stated that if they did not receive response in one week, the Trust would file suit to compel Tri-State to produce

---

[51] 6 *Del. C.* §§ 18-101–18-1208 ("LLC Act").

[52] Compl. Ex. 4 (citing 6 *Del. C.* § 18-305).

[53] Demand 1–2.

[54] *See* Demand 2–3.

[55] Compl. ¶ 25; Ans. ¶ 25; *see* Compl. Ex. 5.

[56] Compl. Ex. 5.

the requested books and records.[57] On August 15, Ed responded to the Demand via email to the Trust's attorney.[58] Ed characterized the Demand as "harassment" because the Trust already "has access to the ba[n]k account and information regarding the" JP Court Action.[59] The email concluded with a warning that if the Trust continued to pursue legal action, Tri-State would "need to reimburse all parties . . . for their time to respond[.]"[60] Tri-State did not otherwise respond the Demand.[61] After some back and forth, Tri-State ultimately produced a copy of the Judgment and Tri-State's tax returns on December 4.[62]

Tensions appeared to cool for the next few months. Then, on April 24, 2017, Bob and Thelma emailed Laurie inquiring about a payment deposited in Tri-State's bank account from the Kent County Levy Court.[63] Gary replied later that day, informing Bob and Thelma the payment was for a sewer-line easement on the Farm.[64] Gary continued that, with receipt of the easement

---

[57] *See* Compl. Ex. 5.

[58] Compl. Ex. 6.

[59] *Id.*

[60] *Id.*

[61] *See* Compl. ¶¶ 31–32, Exs. 6–7.

[62] Compl. ¶¶ 31–33, Exs. 7–8; Ans. ¶¶ 31–33.

[63] Compl. Ex. 10.

[64] Compl. Ex. 11.

payment, there could "be a final distribution of the capital" the Cannons lent to Tri-State for the Farmhouse Repairs.[65]   Gary concluded his email by recommending Tri-State's board meet and asking Bob and Thelma when they wanted to schedule the meeting.[66]

Bob responded to Gary's email on May 19.[67]  In his email, Bob laid out a litany of proposed agenda items related to Tri-State's record keeping, the Judgment, the sewer-line easement, the Farm appraisal, and the financial records related to the Farmhouse repairs.[68]

On June 15, after receiving no response, Bob's counsel contacted Gary to follow up on his May 19 email and suggest potential meeting dates.[69] Plaintiffs allege that Gary responded to counsel's email refusing to meet on the proposed dates and that defendants "avoided the member meeting."[70]

## II.   PROCEDURAL POSTURE

On March 2, 2018, plaintiffs filed the Complaint, asserting six causes of action against defendants.  All six counts relate to harm purportedly suffered by

---

[65] *Id.*

[66] *Id.*

[67] *See* Compl. Ex. 11.

[68] *Id.*

[69] *Id.* Ex. 12.

[70] *Id.* ¶¶ 51–57.

the Trust as a member of Tri-State, are asserted against each of Ed, Gary, and Laurie, and do not distinguish between direct and derivative claims.

Count I alleges defendants breached the LLC Agreement in a variety of ways, including misappropriating the $7,000 loan for Farmhouse repairs and the Judgment, entering into the Easement Agreement for inadequate consideration and without plaintiffs' approval, failing to maintain adequate records, and refusing a books-and-records inspection.[71] Count II asserts a claim for breach of the implied covenant of good faith and fair dealing under the LLC Agreement.[72] Count III alleges defendants' actions also breached their fiduciary duties to the Trust as a member of Tri-State in their capacities as the manager and alleged *de facto* managers of Tri-State.[73] Count IV alleges defendants fraudulently induced the Trust to lend the $7,000 for Farmhouse repairs and fraudulently misappropriated the Judgment.[74] Count V alleges defendants conspired to commit the acts complained of in Counts I through IV, so this claim necessarily arises from harms allegedly suffered by the Trust.[75] Finally, Count VI asks the court to order the "involuntary withdrawal of

---

[71] *Id.* ¶¶ 123–34.

[72] *Id.* ¶¶ 135–44.

[73] *Id.* ¶¶ 145–53.

[74] *Id.* ¶¶ 154–63.

[75] *Id.* ¶¶ 164–65.

defendants as members" of Tri-State, purportedly under Article IX, Section 7 of the LLC Agreement.[76]

Defendants answered on April 30, and discovery began.[77] On August 8, 2022, Bob Cannon passed away.[78] Plaintiffs did not file a suggestion of death for Bob.

On June 21, 2024, defendants filed the Motion. The parties stipulated to a briefing schedule and defendants filed their opening brief on January 28, 2025.[79] On March 3 and 6, plaintiffs filed a motion to appoint a guardian *ad litem* for Ed and their answering brief on the Motion, respectively.[80] On March 24, defendants submitted their reply brief in support of the Motion.[81]

On April 7, defendants submitted their opposition to plaintiffs' motion to appoint a guardian *ad litem* for Ed.[82] Plaintiffs submitted their reply in support of appointing a guardian on July 17.[83]

---

[76] *Id.* ¶¶ 166–69.

[77] *See* Ans.; Dkts. 14–37.

[78] Opening Br. 2 n.1; Answering Br. 3.

[79] Dkt. 44.

[80] Dkts. 46–50.

[81] Dkt. 52.

[82] Dkt. 54.

[83] Dkt. 56.

On November 14, defendants filed a suggestion of death for Ed,[84] and plaintiffs moved to substitute Ed's estate as a defendant and withdrew their motion to appoint a guardian *ad litem*.[85] On December 4, the court granted the motion for substitution.[86] On January 9, 2026, the court heard oral argument on the Motion and took it under advisement.[87]

## III. ANALYSIS

Defendants seek summary judgment in their favor on all counts under Court of Chancery Rule 56.[88] Under Rule 56(c), summary judgment will be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Baring v. Condrell*, 2004 WL 5389666, at *3 (Del. Ch. Oct. 18, 2004). When evaluating a motion for summary judgment, "the court must view the evidence in the light most favorable to the non-moving party." *Merrill v. Crothall-Am., Inc.*, 606 A.2d 96 (Del. 1992). "The movants have the initial burden of demonstrating the absence of a material factual dispute. If the movants meet their burden, the burden shifts to

---

[84] Dkt. 60.

[85] Dkts. 61–62.

[86] Dkt. 64.

[87] Dkt. 65.

[88] *See generally* Opening Br.; Reply Br.

the nonmovant to present some specific, admissible evidence that there is a genuine issue of fact for a trial." *Ogus v. SportTechie, Inc.*, 2023 WL 2746333, at *9 (Del. Ch. Apr. 3, 2023). If the opposing party does not properly respond "the court must accept as true the uncontested facts set forth in the record" and "[s]o long as the uncontested facts provide a legal basis for summary judgment, the court will grant the movant's motion." *Kulak v. On*, 2026 WL 1122367, at *6 (Del. Ch. Apr. 24, 2026) (quotations omitted).

"[T]here is no absolute right to summary judgment, and it is within the discretion of the presiding judicial officer to require a developed record before rendering a decision on the merits." *Gerald N. & Myrna M. Smernoff Rev. Trs. v. King's Grant Condo. Ass'n*, 2022 WL 6331860, at *1 (Del. Ch. Oct. 10, 2022) (citations omitted). "Even where the facts are not in dispute, a court may decline to grant summary judgment where a more thorough exploration of the facts is needed to properly apply the law to the circumstances." *In re Tri-Star Pictures, Inc. Litig.*, 1995 WL 106520, at *5 (Del. Ch. Mar. 9, 1995). Also, the court must deny a motion for summary judgment "when the record is ambiguous, where material facts are missing, or when both parties put forth conflicting evidence such that there is an issue of material fact." Donald J. Wolfe & Michael A. Pittenger, CORPORATE AND COMMERCIAL PRACTICE IN THE

Delaware Court of Chancery § 4.08[c] (T. Brad Davey et al. eds., 2d ed. 2026).

Defendants contend summary judgment is appropriate for six reasons. First, defendants contend plaintiffs lack standing to assert any of the counts in the Complaint.[89] Second, defendants contend there is no genuine issue of material fact on the breach of contract claim (Count I).[90] Third, defendants contend the claims for breach of fiduciary duty (Count III) and fraud (Count IV) are barred because they are "duplicative" and "superfluous" with the breach of contract claim (Count I).[91] Fourth, defendants contend the implied covenant claim (Count II) fails because the LLC Agreement completely addresses all claims between the parties so there is no gap to be filled.[92] Fifth, in a footnote, defendants contend the civil conspiracy claim is "legally deficient" because defendants have not committed an underlying wrong.[93] Sixth, defendants contend that the involuntary withdrawal claim fails because it is inconsistent

---

[89] *See id.* 14–18.

[90] *See id.* 18–20.

[91] *See id.* 20.

[92] *See id.* 20–21.

[93] *See id.* 21 n.6.

with the language of the LLC Agreement and there is an available remedy (damages) if defendants have breached the LLC Agreement.[94]

Plaintiffs oppose summary judgment in three ways. First, they argue that all three of the current plaintiffs—the Trust, Thelma, and Jerry—have standing.[95] Second, they essentially abandon the factual allegations of their Complaint and argue that summary judgment is inappropriate based on an entirely new theory of the case that plaintiffs never pleaded, relating to a power of authority Ed granted to Gary around the same time the Complaint was filed.[96] Third, they argue Count VI (involuntary withdrawal) survives as to Ed based on their never-pleaded theory of the case relating to the power of attorney,[97] and as to Gary and Laurie because their "wrongful and harmful conduct to the Cannon Trust and the Company . . . amounts to an event of 'involuntary withdrawal' under [the LLC] Agreement[.]"[98]

---

[94] *See id.* 21–22.

[95] *See* Answering Br. 7–9.

[96] *See id.* 9–15.

[97] *See id.* 15–19.

[98] *See id.* 20.

A.      **There Are Genuine Issues of Material Fact that Preclude Summary Judgment on Standing**

The Supreme Court has explained that standing "refers to the right of a party to invoke the jurisdiction of a court to enforce a claim or to redress a grievance." *In re COVID-Related Restrictions on Religious Servs.*, 326 A.3d 626, 644 (Del. 2024) (quoting *Dover Hist. Soc. v. City of Dover Plan. Comm'n*, 838 A.2d 1103, 1110 (Del. 2003)).  It is "a threshold question that must be answered by a court affirmatively to ensure that the litigation before the tribunal is a 'case or controversy' that is appropriate for the exercise of the court's judicial powers." *Id.*  Absent a specific statutory grant of review, to have standing a plaintiff must demonstrate that (1) the plaintiff suffered an injury-in-fact; (2) there is a causal connection between the injury and the complained of conduct; and (3) that the injury will likely be redressed by a favorable court decision. *Id.* at 644 (citing *Albence v. Higgin*, 295 A.3d 1065, 1086 (Del. 2022)).  This issue is confined solely to "the question of who is entitled to mount a legal challenge and not with the merits of the subject matter in controversy." *Dover Hist. Soc.*, 838 A.2d at 1110.

**1.      There Is A Genuine Issue of Material Fact as to Whether Bob Held the Membership Interest in Tri-State Directly or Through The Trust**

Defendants contend the Trust is not a member of Tri-State and, therefore, lacks standing because (they say) Bob held the membership interest directly, not through the Trust, and he never subsequently assigned or transferred the membership interest to the Trust.[99]  Defendants rely on three pieces of evidence in support of their arguments.  First is the LLC Agreement listing Bob as a member of Tri-State.[100]  Second, they point to a sewer line easement between Kent County and Tri-State that Bob executed as the "owner" of Tri-State.[101]  Third, defendants present three years of Tri-State Schedule K-1 tax forms that identify Bob, not the Trust, as a member.[102]  Together, defendants contend, these documents prove that the Trust is not a member, and lacks standing to bring this lawsuit.[103]

Plaintiffs dispute this, arguing there is substantial evidence Bob intended for the Trust, not himself, to hold the membership interest.  They point to a

---

[99] Opening Br. 15–18 (citing DX C and DX M (also submitted as PX A)); Reply 7–8.

[100] *Id.* 17 (citing LLC Agreement).

[101] *Id.* (citing DX N).

[102] *Id.* (citing DX O).  *See also* DX O Box I1 (identifying the partner as an "[i]ndividual").

[103] *Id.* 18.

membership certificate issued to the Trust concurrently with the three other certificates,[104] and an email from Owen (the attorney responsible for forming Tri-State) to Bob and Bob's attorney seeking to confirm his expectation that the membership certificate should be issued in the name of the Trust (as it was).[105]

"Under the LLC Act, a 'member' is 'a person who is admitted to a limited liability company as a member as provided in § 18-301.'" *Riverside Risk Advisors LLC v. Chao*, 2022 WL 14672745, at *18 (Del. Ch. Oct. 26, 2022) (citing 6 *Del. C.* § 18-101(13)). Section 18-301, in turn, provides that a member is admitted in connection with the formation of a limited liability company "when the person's admission is reflected in the records of the limited liability company or as otherwise provided in the limited liability company agreement." 6 *Del. C.* § 18-301(a)(2).[106]

Plaintiffs argue that the Trust's membership was granted in connection with Tri-State's formation, so its membership may be established by Tri-State's

---

[104] Answering Br. 7–8; PX A.

[105] Answering Br. 7–8; PX B ("I am preparing the membership certificates and assume your client has a revocable trust and would want to title his interest in the trust."). This email was sent on March 23, 2011, eight months after Bob and Thelma created the Trust. *Compare* PX B, *with* Trust Decl. 1, 28. The Trust Declaration states Bob's and Thelma's intent that the Trust would hold all of their assets. *See supra* note 9.

[106] Under the LLC Act, a "person" is broadly defined to include entities such as trusts. 6 *Del. C.* § 18-101(14).

records.  Those records, however, paint two conflicting portraits of events.  The LLC Agreement, the Schedule K-1s, and the easement agreement all suggest Bob, individually, was a member of Tri-State at its formation.[107]  But the membership certificate issued to the Trust is dated within one month of the LLC Agreement,[108] and the email from Owen to Bob's attorney shortly after the LLC Agreement was executed contradict defendants' evidence.[109]  Thelma also contributed to the Farmhouse repairs with checks issued by the Trust.[110]  Nor is there any evidence in the record that conclusively resolves the inconsistencies, such as a contract where Bob assigned or transferred his interest to the Trust.  Gary also testified in his deposition that "the initial members of Tri-State" were its only members, and that "never changed."[111]

Defendants have failed to establish that there is no genuine issue of material fact that Bob held the membership interest in Tri-State directly instead of through the Trust.  Summary judgment is thus inappropriate on the question of standing.

---

[107] LLC Agreement Ex. A (initial members of Tri-State); DX N; DX O.

[108] *Compare* LLC Agreement at Recitals, *19 (dated June 25, 2010) *with* PX A (dated July 27, 2010).

[109] PX A; PX B.

[110] Compl. Ex. 16.

[111] Gary Dep. Tr. 106–07.

### 2. If the Trust Holds the Membership Interest, Thelma Appears To Be the Only Proper Plaintiff

This does not mean the Trust is itself a proper plaintiff even if the court determines at trial it holds the membership interest in Tri-State. The parties did not brief this aspect of standing, but the Trust is a living trust formed under Virginia law.[112] Under Virginia law, a common law living trust does not have a separate legal status, so it has no legal standing to sue. *Jimenez v. Corr*, 764 S.E.2d 115, 122 (Va. 2014) ("[A]n inter vivos trust is inseparable from the parties related to it, and the trust does not have separate legal status.") (citing Restatement (Second) of Trusts § 2 (1959).[113] And because it lacks separate legal status, the trustee—not the trust—is the proper party to any litigation involving trust property (like the membership interest in Tri-State). *Plofchan v. Plofchan*, 855 S.E.2d 857, 865 (Va. 2021) ("Under Virginia law, trustees have the power to '[p]rosecute or defend an action, claim, or judicial proceeding in

---

[112] *See* Tr. Decl. at 1 ("The laws of the Commonwealth of Virginia, applied by and in the courts of the forum chosen by the then-acting trustee shall govern this Declaration of Trust and all controversies arising from it.").

[113] *See also Grenco Real Estate Inv. Tr. v. Brooker*, 211 S.E.2d 33, 34 (Va. 1975) ("[A]t common law a trust could not ordinarily sue in its own name but only by its trustees."). This is also true under Delaware law. *See Mennen v. Wilmington Tr. Co.*, 2013 WL 4083852, at *9 (Del. Ch. July 25, 2013) ("Under the current state of our law, the common law rule is that a trust is not a separate legal entity, unless specifically defined as such for purposes of a particular statute.") (citing RESTATEMENT (THIRD) OF TRUSTS § 2 and Ct. Ch. R. 17(a)).

any jurisdiction to protect trust property and the trustee in the performance of the trustee's duties.'") (quoting Va. Code Ann. § 64.2-778).

Nor does Jerry appear to be a proper plaintiff if the Trust holds the membership interest in Tri-State. Jerry is a remainder beneficiary.[114] Under Virginia law, beneficiaries only have standing to assert claims against third parties on their trust's behalf when the trustee improperly refuses or neglects to pursue such claims. *See Burton v. Dolph*, 89 Va. Cir. 101, 113 (Va. Cir. Ct. 2014) (quoting RESTATEMENT (SECOND) OF TRUSTS § 282). This is "an exception to the general rule that trustees alone are competent to bring suit against third parties." *Id*.[115] Thelma is a plaintiff here.

It thus appears that if the Trust holds the membership interest in Tri-State, Thelma is the only proper plaintiff.

## B. Summary Judgment On the Substantive Claims of the Complaint Is Inappropriate

Due to the uncertainty as to whether the Trust or Bob held the membership interest in Tri-State before Bob's death, the court believes it would be inappropriate to consider defendants' arguments for granting summary

---

[114] Tr. Decl. art. Two, § B.

[115] *See also* RESTATEMENT (THIRD) OF TRUSTS § 107 (2012) (explaining a beneficiary may only bring a claim related to the trust or its property against a third party if the "beneficiary is in possession, or entitled to immediate distribution, of the trust property involved" or the trustee is "unable, unavailable, unsuitable, or improperly failing to protect the beneficiary's interest.").

judgment on the substance of the Complaint. Each of those counts is premised on the Trust, not Bob, having held the membership interest in Tri-State.[116] If Bob held the membership interest, the parties have not put before the court an adequate record on which the court can determine as a matter of law what effect that has for each of the claims plaintiffs have asserted in the Complaint. *See In re El Paso Pipeline P'rs, L.P. Deriv. Litig.*, 2014 WL 2768782, at *9 (Del. Ch. June 12, 2014) ("[T]he court may, in its discretion, deny summary judgment if it decides upon a preliminary examination of the facts presented that it is desirable to inquire into and develop the facts more thoroughly at trial in order to clarify the law or its application.").

## IV. CONCLUSION

Upon review of the evidence in the light most favorable to plaintiffs as the non-moving party, I find that there are genuine issues of material fact as to whether Bob held the membership interest in Tri-State directly or through the Trust, and thus there is a genuine issue of material fact whether the Trust, through Thelma as its trustee, has standing to pursue claims against defendants. Due to this uncertainty as to whether the court has the proper plaintiff before it, it would be better for the court to consider those claims on a trial record after

---

[116] *See, e.g.*, Compl. ¶ 127 ("Rental income owed [to] the *Cannon Trust* [was] unlawfully distributed to Defendants . . . ." (emphasis added)).

the court has determined the proper plaintiff. For these reasons, I recommend the court deny defendants' motion for summary judgment in full.

This is a Report under Court of Chancery Rule 144(b)(1). Under Court of Chancery Rule 144(c)(2)(A), exceptions to this Report are stayed pending issuance of a Final Report in this case.

Very truly yours,

/s/ *Christian Douglas Wright*

Magistrate in Chancery